1

```
 1          IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
                       DUPAGE COUNTY, ILLINOIS
 2

 3
       THE VILLAGE OF LISLE,           )
 4                                     )
                 Plaintiff,            )
 5                                     )
            -vs-                       ) No. 21 DT 872
 6                                     )      Summary Suspension
       ALEX AUBREY FRENCH,             )
 7                                     )
                 Defendant.            )
 8

 9

10                     REPORT OF PROCEEDINGS had at the hearing

11     of the above-entitled cause, before the HONORABLE

12     MICHAEL W. FLEMING, judge of said court, on the 9th day

13     of June, 2021.

14

15     PRESENT:

16         MICHELLE MOORE LAW, by
           MS. MICHELLE MOORE NORTON,
17
               appeared on behalf of the Village of Lisle;
18
           RAMSELL & ASSOCIATES, by
19         MR. DONALD RAMSELL,

20             appeared on behalf of Alex Aubrey French,
               Defendant.
21

22

23     Marcia Messina, CSR
       Official Court Reporter
24     CSR 084-003955
```

1                        I N D E X

2    OPENING STATEMENT                        PAGE

3         On behalf of the Defendant ...............   5

4         On behalf of the Village of Lisle ........   7

5

6    WITNESS                                  PAGE

7    OFFICER WILLIAM WISE

8         Direct Examination by Mr. Ramsell ........   9

9         Cross-Examination by Ms. Norton ..........  38

10        Redirect Examination by Mr. Ramsell ......  62

11

12   CLOSING ARGUMENT                         PAGE

13        On behalf of the Defendant ...............  76

14        On behalf of the Village of Lisle ........  90

15        Rebuttal on behalf of the Defendant ......  95

16

17

18

19

20

21

22

23

24

1    THE COURT:  Next case is Village of Lisle vs. Alex
2    French.
3        MS. NORTON:  Michelle Norton on behalf of the
4    Village.
5        MR. RAMSELL:  Don Ramsell on behalf of Mr. French
6    who's here as well, Judge.  We want to pass this for
7    statutory summary suspension hearing this morning.
8        THE COURT:  Very good.
9        MR. RAMSELL:  What time?
10       MS. NORTON:  10:30, Judge?
11       THE COURT:  Yeah, 10:30 would be great.
12       MS. NORTON:  Thank you.
13       MR. RAMSELL:  Mr. French, go to the courtroom.  Be
14   there before 10:30.  Thank you, Judge.
15       THE COURT:  Thank you.
16               (Whereupon, the Court attended to other
17                matters on the call, after which the
18                following proceedings were had herein:)
19       THE CLERK:  Lisle, Alex French.
20       MR. RAMSELL:  French.
21       MS. NORTON:  Good morning, Your Honor.  Michelle
22   Norton, N-O-R-T-O-N, on behalf of the Village.
23       MR. RAMSELL:  Don Ramsell on behalf of Mr. French
24   who is also present, Judge.

1      THE COURT:  All right.  Mr. Ramsell, do you have an
2  extra copy of your petition?
3      MR. RAMSELL:  I've probably got, like, 62 of them.
4      THE COURT:  I just need one, but it's -- you know,
5  in this day and age with the filing of electronics.
6                 (Document tendered.)
7      THE COURT:  All right.  It comes on the Defendant's
8  petition to rescind statutory summary suspension.  Both
9  sides answering ready, any preliminary motions before we
10  begin?
11      MR. RAMSELL:  No.
12      MS. NORTON:  None from the Village, Judge.
13      THE COURT:  Okay.
14      MS. NORTON:  I'd just ask what grounds Mr. Ramsell
15  is proceeding --
16      MR. RAMSELL:  Well, then I'd move to exclude the
17  witness and then we'll discuss grounds if that's okay.
18      THE COURT:  Okay.  Officer, can you step out for
19  just a second?  And I can let everybody know that I am
20  handling the Glendale Heights traffic call at
21  1:00 o'clock, so we'll see how much we can get done.
22  Hopefully we can finish before.
23                 (Officer Wise exited the courtroom.)
24      MR. RAMSELL:  Judge, if I could make an opening

1    statement, that's probably an easier way to explain what

2    I'm going on.

3         THE COURT:  Sure.

4         OPENING STATEMENT OF BEHALF OF THE DEFENDANT

5         MR. RAMSELL:  Okay.  This is an interesting case.

6    Officer's on routine patrol, sees some cars going

7    around.  It looks unusual.  He pulls up.  There's a car

8    out of gas.  It's the Defendant.  He's pouring gas in

9    the tank of his car.  Officer takes the license and

10   retains it, which we would submit is now a seizure.  And

11   the video and audio shows the -- my client talking, very

12   clear speech, good balance, says he ran out of gas.  The

13   officer continues to retain the license, goes back,

14   runs -- checks, I guess, while my client is filling his

15   car with gasoline.  After my client finishes filling the

16   car with gasoline, a few attempts to start it to get the

17   gas to the engine, it starts.  Then the officer has the

18   Defendant perform field sobriety tests.

19        Now, at this point we're going to argue

20   that -- and the officer's report says the only thing

21   he's observed at this point is bloodshot eyes, no smell

22   of alcohol, no slurred speech, no nothing.  At this

23   point, Judge, we're going to say the seizure -- even

24   though there might have been an improper parking -- is

1   unlawfully prolonged.  I've got the case law from the

2   Second District.  No. 1, retention of a driver's license

3   is a seizure.  No. 2, requests for field sobriety tests

4   is a seizure that requires reasonable suspicion.

5           I've got a recent case that comes out of the

6   Second District called *People v. Patel*, not the one on

7   discovery but the new one.  And in *Patel* they said that

8   the admission to drinking coupled with slurred speech

9   and bloodshot eyes was a reasonable suspicion to request

10  field sobriety tests.  They cite a couple more cases.

11  All of them have the smell of alcohol and something -- a

12  couple more things.  This is bloodshot, watery eyes

13  only; so we're going to take the position that the

14  unlawfully prolonged seizure of the Defendant is a basis

15  for recision.  And then the video will speak for itself,

16  continuing further.  Ultimately, he's arrested for a

17  DUI.  We're going to argue that the arrest was also not

18  supported with probable cause.

19          THE COURT:  Okay.

20          MS. NORTON:  So you're not addressing the refusal

21  or -- It's just a probable cause issue and a --

22          MR. RAMSELL:  I'm not feeling like it at this

23  minute, but I'm not waiving it; so --

24          MS. NORTON:  Okay.

1    MR. RAMSELL:  There could be issues with refusal

2    and warning to motorist too, but these are -- I just

3    wanted to feature some things that I'd ask Your Honor to

4    pay particularly close attention to.

5    THE COURT:  Okay.

6    MS. NORTON:  Are you done?

7    MR. RAMSELL:  I am done.

8    OPENING STATEMENT ON BEHALF OF THE VILLAGE OF LISLE

9    MS. NORTON:  Okay.  Judge, just so that I --

10   Briefly in response, I think the Court will obviously

11   hear from the officer and have an opportunity to observe

12   the video.  There was other -- There were other indicia

13   of impairment that the officer observed including

14   spilling the gas while he was trying to get the tank

15   filled.  Defendant also made a number of statements that

16   were not consistent, as I recall; and there was also

17   other information that the officer obtained in the

18   course of his initial contact with the Defendant that

19   ultimately -- certainly justified his initial stop with

20   respect to Terry.  And then, as things developed, he

21   ultimately did develop reasonable grounds; and I think

22   the Court will find that to be the case.

23   THE COURT:  Okay.  Well, we'll see how much we can

24   get done by noon and then we'll go from there.  I

```
1    appreciate the comments of both counsel.
2          MR. RAMSELL:  All right.  Here's the case law
3    that ...
4          MS. NORTON:  I'll acknowledge receipt, Judge, of a
5    copy of People vs. Rockey, R-O-C-K-E-Y, and whatever
6    else Mr. Ramsell is dishing out here.
7                Are you calling Officer Wise?  Because I'll
8    go get him.
9          MR. RAMSELL:  Yep.
10                     (Officer Wise entered the courtroom.)
11                     (Witness sworn.)
12         MS. NORTON:  And, Judge, I've asked this
13   previously.  We are somewhat socially distanced here.
14   I'm fully vaccinated.  Is it okay if I remove my mask?
15         THE COURT:  Yes.  Likewise, Mr. Ramsell, if you've
16   been full vaccinated, you can remove your mask.
17         MS. NORTON:  Thank you.
18         MR. RAMSELL:  Yes, I have.  May I proceed,
19   Your Honor?
20         THE COURT:  Yeah.  If you've been fully vaccinated,
21   you can remove your mask.
22         MR. RAMSELL:  Yes.
23         THE COURT:  You may.
24         MR. RAMSELL:  Vaccinated?
```

1          THE WITNESS:  Yes, sir.

2          MR. RAMSELL:  Not under oath yet.

3          THE COURT:  No, he's under oath.

4          MR. RAMSELL:  All right.  Then that's the truth.

5          MS. NORTON:  And he is vaccinated.

6                    OFFICER WILLIAM WISE,

7    called as a witness herein, having been first duly

8    sworn, was examined and testified as follows:

9                    DIRECT EXAMINATION

10   BY MR. RAMSELL:

11        Q.   Sir, could you, please, state your full name

12   and spell your last name for the court reporter.

13        A.   William Wise spelled W-I-S-E.

14        Q.   Calling your attention to Wednesday,

15   April 28th of the year 2021 at around 9:52 p.m., were

16   you employed and on duty as a law enforcement officer

17   with the Village of Lisle?

18        A.   I was, yes.

19        Q.   At that time did you have occasion to be in

20   the front parking lot of the Lisle Police Department

21   monitoring traffic?

22        A.   I was, yes.

23        Q.   And you saw several vehicles going northbound

24   Illinois Route 53 in about the 5000 block begin to slow

1    and/or stop within the curb lane and ultimately change

2    lanes?

3        A.    Correct.

4        Q.    As a result of that, you went to see what was

5    the matter?

6        A.    Well, my -- I looked that way and then I

7    observed a vehicle, yes.

8        Q.    All right.  You saw an all black colored Jeep

9    Wrangler stopped in the curb lane of northbound Illinois

10   Route 53 just north of the Lisle Police Department with

11   no exterior lights illuminated or any hazard lights

12   flashing?

13       A.    That's correct.

14       Q.    And so then you pulled out and you positioned

15   your fully marked squad car behind that Jeep, activated

16   your emergency lights, and began to investigate further?

17       A.    Correct.

18       Q.    All right.  All of this was accurately audio-

19   and video-recorded at this point moving forward?

20       A.    Yes.

21       MR. RAMSELL:  Judge, at this point I'd like to play

22   the video.

23       THE COURT:  Great.  And both parties stipulate that

24   the court reporter doesn't have to take down the audio

1    portion of the video?

2         MS. NORTON:  Yes, Your Honor.

3         MR. RAMSELL:  Yes.

4         MS. NORTON:  Mr. Ramsell, it looks like the volume

5    isn't on; so you just might want to make sure that the

6    volume is activated.

7         THE WITNESS:  If I may, the audio kicks in after a

8    few minutes.

9              (Whereupon, a videotape was played.)

10        MR. RAMSELL:  Your Honor, could the record reflect

11   that I have turned off the -- I have stopped the video

12   when the counter on the video displays 21 minutes and

13   6 seconds?

14        THE COURT:  Sure.

15   BY MR. RAMSELL:

16        Q.   All right.  Officer Wise, did you decide to

17   arrest Mr. French because he declined to do these tests?

18   Did that play into your decision to arrest him?

19        A.   No, that was not the sole issue.  I took --

20        Q.   No.  I didn't ask if it was the sole issue.

21   Was one of the reasons you arrested him because he

22   declined to take your tests?

23        A.   At that point I placed him under arrest

24   because we weren't moving forward any further, so --

1      MR. RAMSELL:  Nonresponsive, Judge.

2   BY THE WITNESS:

3      A.    -- yes.

4      MR. RAMSELL:  I'm sorry.  I asked him whether one

5   of the reasons why he arrested Mr. French, was it

6   because he declined to do the tests; and I kind of need

7   an answer to that question.

8      THE WITNESS:  And I just said, Yes.

9      THE COURT:  And he said, Yes.

10     MR. RAMSELL:  Okay.  Thanks.

11  BY MR. RAMSELL:

12     Q.    Now, at the beginning of your interaction

13  with Mr. French you asked him for identification?

14     A.    Correct.

15     Q.    What did he give you, a driver's license?

16     A.    Yes.

17     Q.    It was facially valid?

18     A.    Yes.

19     Q.    And you took that driver's license and then

20  ran him, so to speak?

21     A.    Correct.

22     Q.    And no warrants outstanding; everything was

23  okay?

24     A.    Correct.

1       Q.   Then you retained that driver's license

2 throughout your interaction with Mr. French?

3       A.   I did.

4       Q.   So he was not able to leave without you

5 returning his license?

6       A.   Correct.

7       Q.   And as you retained his license, you had the

8 conversation that unfolded on the video. I'm not going

9 to repeat all that. I'm just going to try and cover

10 some stuff. You wrote a report in this case that's

11 complete and accurate?

12       A.   Yes, sir.

13       Q.   And in your report you note the first thing

14 you smelled was an odor of gasoline?

15       A.   Correct.

16       Q.   As if it had been spilled and some was also

17 spilled on the street?

18       A.   Yeah. I also visually observed it, yes.

19       Q.   And in your report you indicate that the

20 first time you smelled what you say was an odor of

21 alcoholic beverage emitting Mr. French was during the

22 HGN test?

23       A.   Correct.

24       Q.   Prior to the HGN test, what did you observe

14

1    that was consistent with alcohol intoxication prior to

2    the HGN test?

3         A.    Just -- I mean, one was the fact that the

4    vehicle was stopped on a dark road with no hazards.  I

5    found that odd.

6         Q.    So that's something you think -- when you see

7    that you think, That person might be under the influence

8    of alcohol?

9         A.    It's certainly something I consider.

10        Q.    Have you -- You said on tape you're a

11   certified, you know, instructor on DUI.

12        A.    For standardized field sobriety testing.

13        Q.    Yeah.  And in your student course you were

14   taught about the cues of impaired driving that are noted

15   by the National Highway Traffic Safety Administration?

16        A.    Correct.

17        Q.    Okay.  You consider that to be authoritative

18   and reliable in the area of DUI detection and field

19   sobriety testing?

20        A.    Yes, I do.

21        Q.    Is a car stopped without its lights on --

22   stopped without its lights on a cue of impaired driving,

23   according to NHTSA?

24        A.    According to NHTSA, no.

1    Q.    So did -- There's like, what, 24 -- 27 cues

2    of impaired driving, something like that?

3         A.    Something like that.  I don't know the exact

4    number off the top of my head.

5         Q.    There were no cues of impaired driving noted

6    in this case, you would agree, right?

7         A.    Of actual driving, no.

8         Q.    No -- Okay.  So there's kind of like three

9    phases to DUI detection, according to your training:

10   vehicle in motion, personal contact, and pre-arrest

11   testing, yes?

12        A.    Correct.

13        Q.    All right.  So the vehicle in motion would be

14   those cues.  None of those existed.  Let's talk about

15   personal contact.  In the personal contact phase you're

16   taught to see, hear, smell.  Remember, those three

17   cues -- three things you're taught as a student?

18        A.    I do, yes.

19        Q.    And you also -- You said you were an

20   instructor too?

21        A.    Yes.

22        Q.    Okay.  So here, in this case, when we talk

23   about "see," that would be to observe balance and

24   everything about the person and about the scene, yes?

1       A.    Correct.

2       Q.    "Hear" would be if you hear some impaired

3  speech or the person makes admissions to using alcohol

4  or drugs, yes?

5       A.    What's the question?

6       Q.    See, hear, smell --

7       A.    Correct.

8       Q.    -- these are the things that a person

9  investigating a DUI would have in front of them during

10  the personal contact phase?

11      A.    I understand that.  I was asking what the

12  question was.

13      Q.    All right.  So during the "hear" portion did

14  you hear any impaired speech?

15      A.    Towards the end of our interaction, yes.

16      Q.    I'm sorry.  You filled out a search warrant

17  in this case.  Did you tell the judge that there was

18  impaired speech?

19      A.    It probably is in my narrative.

20      Q.    Pardon?

21      A.    I said, It should be in my narrative.

22      Q.    Where -- Is the speech that we're hearing on

23  this audio and video recording accurate?

24      A.    It is.

1        Q.   And you're saying that speech is impaired

2   speech?

3        A.   I said -- In my report I said that, at times,

4   the more animated that the Defendant got there was

5   sometimes some mumbling of the speech.

6        Q.   Is any of that displayed on this video the

7   judge is watching today, what you say is the impaired

8   speech?

9        A.   Yes.

10       Q.   All right.  And then "smell" would be smells

11   like alcohol, et cetera, yes?

12       A.   Correct.

13       Q.   Okay.  So Mr. French puts the gasoline in his

14   car, starts the car while you retain his driver's

15   license?

16       A.   He attempts to put gas in the car and

17   attempts to start it.

18       Q.   It didn't start?

19       A.   No.  It didn't turn over.

20       Q.   Okay.  Then he comes back and he puts more

21   gas in the car?

22       A.   Again, attempts to, yeah.

23       Q.   You found it odd that there was a smell of

24   alcohol about him -- or, excuse me, a smell of gasoline

1    about him?

2        A.    I found -- I didn't find it odd.  I just

3    noted that gas had been spilled along the side of his

4    car on the ground.

5        Q.    Okay.  Is that consistent with an impaired

6    driver?

7        A.    It could be.

8        Q.    And so could just be breathing, I suppose.

9    Impaired drivers breathe?

10       MS. NORTON:  Objection, argumentative.

11       MR. RAMSELL:  It is.  It's terribly argumentative.

12   I agree, Judge.  I withdraw the question.

13       THE COURT:  Thank you.

14   BY MR. RAMSELL:

15       Q.    Now, how would you describe his balance on

16   this video, the 20 minutes that were played?

17       A.    At times it was fine; at other times it

18   wasn't what it should be.

19       Q.    Well, tell us what you saw that wasn't what

20   it should be since I don't understand what that really

21   means.

22       A.    Well, when I instructed him to stand with his

23   right food in front of his left, heel to toe with his

24   arms down to his side, when I was trying to explain the

1  walk-and-turn test it's evident on the video that he

2  steps out of that position several times and could not

3  maintain the proper position.

4      Q.    All right.  So I'm going to talk about the

5  tests here that you did give, okay.  First off,

6  horizontal gaze nystagmus, there's a very specific

7  procedure by NHTSA as to how to perform that test, yes?

8      A.    Yes.

9      Q.    And one of them is that when you're checking

10 for distinct and sustained nystagmus at maximum

11 deviation in each eye -- that would mean when you move

12 your finger or your lighted pen tip out to the side;

13 that's what we call maximum deviation where there's no

14 white showing in the corner of the eye?

15     A.    Correct.

16     Q.    And then you are to hold it there for a

17 minimum of four seconds, yes?

18     A.    Correct.

19     Q.    You watched that video today, didn't you?

20     A.    I did.

21     Q.    You're supposed to check each eye twice for

22 that phase?

23     A.    Correct.

24     Q.    So four times you need to hold your finger at

1    the point of maximum deviation for a minimum of four

2    seconds?

3         A.   Correct.

4         Q.   And if you deviate from the standardized

5    procedure, according to your training, the validity of

6    the test is compromised, yes?

7         A.   Yes, sir.

8         Q.   Now, in the video, isn't it true you did not

9    hold your finger to the point of maximum deviation for a

10   minimum of four seconds on four occasions?

11        A.   I believe I did.

12        MR. RAMSELL:  Okay.  Let's go back and look at it.

13   I'm going to set it up here, Judge.

14                  (Whereupon, a videotape was played.)

15        MR. RAMSELL:  For the record -- I apologize, but

16   I've got to say this.  For the record, I'm starting the

17   video at 9:40.

18        THE COURT:  Okay.

19                  (Whereupon, a videotape was played.)

20   BY MR. RAMSELL:

21        Q.   Okay.  The first thing you do is move your

22   stylus from center to left and center to right to check

23   for equal tracking?

24        A.   Correct.

1    Q.    And you're just going to do that once each

2  side?

3    A.    No, twice each side.

4    Q.    You're going to do it twice each side?

5    A.    Correct.

6    Q.    And that's just to see that the two eyes

7  track together?

8    A.    Correct.

9    Q.    And that's to -- kind of a prequalification

10  for the test, along with resting nystagmus and equal

11  pupil size?

12    A.    Correct.

13    Q.    All right.  So the first -- If we can call

14  center to each side one pass, the other side the second

15  pass -- Can we use that just so we have a language to

16  communicate?

17    A.    Sure.

18    Q.    Okay.  So the first four passes are going to

19  be for -- just for equal tracking?

20    A.    Correct.

21            (Whereupon, a videotape was played.)

22  BY MR. RAMSELL:

23    Q.    All right.  So basically -- I've paused it at

24  10 minutes and 10 seconds.  His eyes -- He wasn't

1    following, so you had to do it -- make the attempt a

2    couple more times; but you did get four passes in?

3         A.    Correct.

4         Q.    And now from 10:10 forward we're going to go

5    to the next phase, which is lack of smooth pursuit?

6         A.    Correct.

7         Q.    And you're going to check each eye twice?

8         A.    Yes.

9         Q.    For a total of four passes?

10        A.    Corrects.

11        Q.    And the speed for that is two seconds out,

12   two seconds in on each pass?

13        A.    Correct.

14        MR. RAMSELL:  And, Judge, I'm going to start it

15   again, for the record.

16                  (Whereupon, a videotape was played.)

17   BY MR. RAMSELL:

18        Q.    All right.  I've stopped after four passes,

19   but it looks like you're going to keep going.  Did you

20   do more than four passes on lack of smooth pursuit?

21        A.    No.  I went right into my --

22        Q.    So the next one right after that you're

23   doing -- you're starting to do now is going to be to

24   check for distinct and sustained nystagmus at maximum

1    deviation?

2          A.    It should be, yes.

3          Q.    And this is where you take it out to the

4    point of maximum deviation; and the procedure would be,

5    hold for a minimum of four seconds, yes?

6          A.    Correct.

7          Q.    Okay.  So we should see your finger out to

8    the side for a minimum of four seconds on each of the

9    next passes?

10         A.    Correct.

11         Q.    And there should be at least four of these

12   types of passes, yes?

13         A.    Yes.

14                    (Whereupon, a videotape was played.)

15   BY MR. RAMSELL:

16         Q.    All right.  So you've completed these four

17   passes, and you're telling the judge that you held your

18   finger out at least four seconds on each of those

19   passes?

20         A.    Yes.

21         Q.    All right.  If the timing on the clock

22   indicates it was less than four seconds on some of those

23   passes, is it your opinion the clock on the computer is

24   incorrect?

1         A.   I don't know what clock you're using.

2         Q.   I'm talking about right here on the bottom

3  left of the screen where it's now displaying 10 minutes

4  and 56 seconds.  If that secondhand shows less than four

5  seconds, is it your opinion that it's the computer

6  that's incorrect?

7        MS. NORTON:  Objection.

8        MR. RAMSELL:  What's the objection?  I don't --

9        MS. NORTON:  It assumes a fact not in evidence.  I

10  haven't heard anything in terms of when each time it was

11  stopping and starting or what the second counter was

12  reading.  That's not in the record.

13        MR. RAMSELL:  Not in evidence?  The video is in

14  evidence.

15        THE COURT:  No, the video is.  I think what she's

16  saying is --

17        MS. NORTON:  I can't see that from here.

18        THE COURT:  -- when he --

19        MR. RAMSELL:  I don't have to help her see it.

20        THE COURT:  No, I know; but I'm saying, if you

21  can -- You're using a cumulative time of 10:56 now and

22  he started it at some previous time.  But when he puts

23  the nystagmus out, if you want to stop it and say, Okay,

24  now it's at 10:40, and then run it again and say -- when

1   he moves it back it's 10:42 as opposed to 10:45.

2        MR. RAMSELL:  So you want me to help break it down

3   more specifically as opposed to, simply, you look at it

4   and you can tell it's less than four seconds from the

5   counter itself?

6        THE COURT:  Well, yeah, I guess --

7        MR. RAMSELL:  Sure.

8        THE COURT:  -- the facts not in evidence is, I

9   didn't --

10       MR. RAMSELL:  Well, it's all in evidence, Judge.

11       THE COURT:  No, I understand.

12       MR. RAMSELL:  It would just require me to do it.

13       THE COURT:  Right, and I can do that on my own if

14   you want.

15       MR. RAMSELL:  No.  I'm a helper, Judge, you know

16   that.

17                 (Whereupon, a videotape was played.)

18       MR. RAMSELL:  All right.  So 10:27, this is the

19   start of the first pass, Judge, where, according to the

20   witness, he needs to hold it out for a minimum of four

21   seconds, okay.

22       THE COURT:  Okay.

23                 (Whereupon, a videotape was played.)

24       MR. RAMSELL:  All right.  It's 10 minutes and

1    30 seconds, so it's only been three seconds and he's

2    already back.  You do that see that, Your Honor.  His

3    stylus is no longer out to the corner.

4         THE COURT:  Okay.

5                   (Whereupon, a videotape was played.)

6         MR. RAMSELL:  Now, that one was three seconds,

7    Judge; and he began to move it back into the center.

8    It's been four on here, but he's already to the other

9    side.  10:32 to 10:36, he's already on the other side.

10   Do you see that, Judge?

11        THE COURT:  Okay.  I had him stopping at -- So

12   10:27 to 10:30, and then it went --

13        MR. RAMSELL:  I'll go back to 10:23.

14                  (Whereupon, a videotape was played.)

15        MR. RAMSELL:  Okay, Judge.  You've seen four

16   passes.  The two on the -- what I would say is the left

17   side looking at the screen were less than four seconds;

18   the two on the right side were four plus.

19        THE COURT:  Okay.

20        MR. RAMSELL:  That's all I wanted to point out.

21   BY MR. RAMSELL:

22        Q.   All right.  The next thing you did was ask

23   Mr. French to say the alphabet or a portion thereof?

24        A.   Yes.

1      Q.    Okay.  According to your training, the

2    alphabet test is not a standardized test?

3      A.    That is correct.

4      Q.    It is not a validated test?

5      A.    Correct.

6      Q.    And by "validated," it means it has not been

7    subjected to any type of analysis to make it valid for

8    impairment; it's not validated?

9      A.    It's a nonstandardized test, yes.

10     Q.    And it's also not validated, you said

11    earlier?

12     A.    Correct.

13     Q.    So.  The three validated tests would be the

14    HGN, the walk-and-turn, and the one-leg stand, yes?

15     A.    Correct.

16     Q.    All right.  Now, the next test after this

17    alphabet exercise was a walk-and-turn test?

18     A.    Correct.

19     Q.    And that test you were taught and also

20    instruct, it requires a dry surface?

21     A.    It doesn't require it, no.

22     Q.    This is in the rain?

23     A.    It was lightly drizzling.

24     Q.    Slightly drizzling.  So it's your testimony

1    that the National Highway Traffic Safety Administration

2    manual -- field sobriety manual does not indicate that

3    it requires a dry surface?

4        A.    The word "required" is -- No, it does not

5    require it.

6        Q.    So your problem is with the word "required."

7    What type of dry surface does it say?

8        A.    Basically, if efforts can be made to make a

9    dry surface, it can; but there's nothing that says the

10   test cannot be performed on a wet surface.

11       Q.    If it reads in the manual, The walk-and-turn

12   test requires a designated straight line and should be

13   conducted on a reasonably dry, hard, level, nonslippery

14   surface, would you agree that's what the manual reads?

15       A.    I haven't seen what you're reading out of,

16   but --

17       Q.    I didn't ask you that.  You're both a student

18   and an instructor.

19       A.    I understand that.

20       Q.    Do you instruct using the manual?

21       A.    Yes, I do.

22       Q.    Does the manual say, A walk-and-turn test

23   requires a designated straight line and should be

24   conducted on a reasonably dry, hard, level, nonslippery

```
1    surface?
2         A.   Yes.
3         Q.   So you noted that Mr. French's eyes were red,
4    bloodshot, and watery in appearance?
5         A.   I did.
6         Q.   All right.  Now, first off, watery -- All
7    living human beings have water on their eyes; the
8    eyeballs have -- are viscus, yes?
9         A.   Yes.
10        Q.   All right.  But in terms of red or bloodshot
11   eyes, in your training as an instructor, you are
12   familiar with the NHTSA manual -- excuse me -- the NHTSA
13   report on the detection of DUI at or below .10 or more
14   from 1997 published by NHTSA?
15        A.   Yes, sir.
16        Q.   And you are aware in that 1997 report that
17   NHTSA eliminated some cues of -- that were considered
18   indicators of intoxication including bloodshot eyes,
19   yes?
20        A.   I'd have to review it, but I'd --
21        Q.   Sure.
22        A.   I'll take your word for it.
23        Q.   I'll show you what I'll mark as Defendant's
24   Exhibit No. 1 for identification.
```

1      MS. NORTON:  Are you going to admit this whole
2  thing?
3      MR. RAMSELL:  No.  I'm just going to refresh his
4  recollection.  Your Honor, may I approach the witness?
5      THE COURT:  Yes.
6      MR. RAMSELL:  I'm going to mark this as Defendant's
7  Exhibit No. 1 for identification.
8      MS. NORTON:  Judge, I would just ask that if the
9  officer's going to be asked to read anything or directed
10  to a particular thing, that it be read in context and
11  not just in isolation.
12      MR. RAMSELL:  I'm going to say that's an abnormal
13  objection of some form.  I don't know what it even
14  means.
15      THE COURT:  All right.
16      MR. RAMSELL:  If I do something wrong, I'll wait to
17  hear what she says.
18  BY MR. RAMSELL:
19      Q.   Sir, I'm showing you what's -- On the
20  front -- I'm really drawing your attention to this page,
21  E, dash, 10, the bottom paragraph.  You can read it to
22  yourself.  Let me know if that refreshes your
23  recollection.
24                  (Witness viewing document.)

1    BY MR. RAMSELL:

2       Q.   All right.  So my question to you is, in 1997

3    did NHTSA eliminate bloodshot eyes as a cue of

4    impairment?

5       A.   According to this, yes.

6       MR. RAMSELL:  Okay.  For the record, I'm removing

7    Defendant's Exhibit No. 1 from the witness, Judge.

8    BY MR. RAMSELL:

9       Q.   Did Mr. French spill a large amount of gas on

10   his hands?

11      A.   I believe he spilled some on his hands.  I

12   don't know if it was a large amount.

13      Q.   Well, you wrote in your report, It was

14   evident that French had spilled a large amount of gas on

15   his hands, the street, and the side of the vehicle?

16      A.   Correct.  I don't --

17      Q.   Right.  So --

18      A.   It was a combination of both.

19      Q.   -- tell me, did the smell of gasoline on his

20   hands continue to exist, let's say, during the HGN test?

21      A.   No.  It -- I noted that the odor of gasoline

22   had dissipated by that point.

23      Q.   All right.  And then it's your testimony that

24   the odor of gas was then replaced by a smell of

1　alcoholic beverages coming from his mouth?

2　　　　A.　　That's when I was able to detect the odor of

3　alcoholic beverage, yes.

4　　　　Q.　　Okay.　And you hadn't been able to smell that

5　for the first 10 minutes of your interaction with

6　Mr. French, this alcoholic beverage?

7　　　　A.　　Not necessarily.　I really didn't have

8　much -- that close of contact with him as compared to --

9　　　　Q.　　I'm asking to argue.　I'm asking a very

10　narrow question.

11　　　　A.　　Yes, I understand.

12　　　　Q.　　During the first 10 minutes of your

13　interaction with Mr. French you had not smelled this

14　odor of alcoholic beverage?

15　　　　A.　　Correct.

16　　　　Q.　　And, you know, I know you said on the video

17　that you wouldn't do the entire test with him or by

18　yourself because of safety concerns, right?

19　　　　A.　　I said I wouldn't do it with him, yes.

20　　　　Q.　　Why are the additional six steps in this

21　case -- why is that where the safety concern happens?

22　　　　MS. NORTON:　Objection.

23　　　　THE COURT:　Overruled.

24　BY THE WITNESS:

1          A.    The safety concern wasn't for an additional

2     six steps.  It was -- The safety concern was walking

3     with him and doing the test with him as he was

4     demanding.

5          Q.    And, you know, the other question I really

6     have is, you know, if -- When he initially said he

7     wasn't going to do the test, you know, why did you

8     spend, like, another six minutes, I guess, arguing with

9     him about it as opposed to -- if you were so certain he

10    was under the influence, why did you just arrest him?

11         A.    I was giving him every opportunity to do the

12    test.

13         Q.    Because it's possible he would have shown

14    that he was not under the influence; is that what you're

15    saying?

16         A.    No, that's not what I'm saying.  I was giving

17    him the opportunity to do additional tests.

18         Q.    Why would somebody want to take this

19    opportunity -- Why would you want to give him an

20    opportunity if it wasn't going to change your mind?

21         A.    Because if I didn't give him the opportunity,

22    he would be arguing that as well.

23         Q.    After he already refused, you think you got

24    to give him six more minutes --

1        MS. NORTON:  Objection.
2    BY MR. RAMSELL:
3        Q.   -- of discussion before --
4        THE COURT:  Sustained.
5        MR. RAMSELL:  Pardon?
6        THE COURT:  It's sustained.
7        MR. RAMSELL:  Okay.
8    BY MR. RAMSELL:
9        Q.   Okay.  When the second officer came to the
10   scene you had a little -- short conversation with that
11   officer, yes?
12       A.   I do.
13       Q.   And at that time, this would have been before
14   you smelled the odor of alcoholic beverage?
15       A.   Correct.
16       Q.   And you said to that officer, you were pretty
17   sure he was drinking.  Do you remember making that
18   statement on this audio?
19       A.   Something to that effect, yes.
20       Q.   Why were you pretty sure he had been drinking
21   if you hadn't even smelled an odor of alcoholic beverage
22   on his breath at that point?
23       A.   Because of the condition of the vehicle,
24   stopped where it was with no lights, and the way he was

1  acting.

2       Q.   Well, what about the way he was acting?

3  Okay.  We get it, he ran out of gas and he didn't put

4  his blinkers on.  What else made you pretty sure he had

5  been drinking?

6       A.   He was looking around constantly, was

7  continually raising his hands even though I told him he

8  was okay.  He was just acting in a nervous manner,

9  sometimes speaking in short sentences.  That's -- I took

10  all of that and felt that he probably was drinking.

11       Q.   So in the NHTSA manual do they indicate that

12  nervousness is a sign of intoxication?

13       A.   Not that specifically, no.

14       Q.   Or jitteriness?

15       A.   No.

16       Q.   Or moving your hands around?

17       A.   No.

18       Q.   So this is your personal opinion that

19  jitteriness and nervousness in your presence is a sign

20  of intoxication or a sign of consumption of alcohol?

21       A.   It can be.  It's based on my experience, yes.

22       Q.   It could be somebody's doing this for a whole

23  plethora of crimes --

24       A.   It's possible.

1        Q.   -- or none at all.  They're just nervous in

2    the presence of an officer.  You know that's a fairly

3    normal scenario.

4        A.   Correct.

5        Q.   But you were pretty sure from those things he

6    had been drinking already?

7        A.   Correct.

8        MR. RAMSELL:  For the record, I'm playing the video

9    starting at 4:54.

10              (Whereupon, a videotape was played.)

11       MR. RAMSELL:  Judge, I've stopped playing it at 6

12   minutes and 10 seconds.  I was trying to find that

13   conversation the officer had with the second guy, and I

14   don't know if it's before or after this.

15       THE COURT:  That's fine.  I don't know if -- I

16   think he kind of summarized it the way --

17       MR. RAMSELL:  Yeah.

18       THE COURT:  -- it was said, so -- Okay.

19       MR. RAMSELL:  I don't think it would add anything.

20   Your Honor, at this point I would rest on my direct.

21       THE COURT:  Okay.  It's now noon, and I have

22   another court call at 1:00 o'clock.  I can be back at

23   2:00 or if the parties want to discuss the possibility

24   of having this continued until tomorrow or Friday.  I'm

```
1    available both days in the morning.
2         MR. RAMSELL:  I'm not available either one, but I
3    can be here at 2:00.
4         THE COURT:  All right.
5         MS. NORTON:  Judge, I'm not sure if they have a
6    staggered call in Glendale Heights.  I don't know how
7    big their call is.
8         THE COURT:  It's not staggered.  It's, I think --
9         THE CLERK:  I can check.
10        THE COURT:  -- 39 cases; so ...
11        MS. NORTON:  Oh, that's not bad.  Okay.  Great.
12   2:00 o'clock is perfect.
13        MR. RAMSELL:  Thank you, Judge.  Your Honor --
14        MS. NORTON:  Officer Wise, you can be back at
15   2:00 o'clock, I take it?
16        THE WITNESS:  Yes.
17        MR. RAMSELL:  I'm sure it goes without saying that
18   the officer cannot discuss his testimony with anybody
19   including the prosecutor because he's still on the
20   stand.
21        THE COURT:  Yeah, that's correct.  Everyone knows
22   that, but we're reminded of it.
23        MR. RAMSELL:  Thank you, Judge.
24        THE COURT:  Thank you.
```

1    Q.   -- or none at all.  They're just nervous in
2    the presence of an officer.  You know that's a fairly
3    normal scenario.
4         A.   Correct.
5         Q.   But you were pretty sure from those things he
6    had been drinking already?
7         A.   Correct.
8         MR. RAMSELL:  For the record, I'm playing the video
9    starting at 4:54.
10                  (Whereupon, a videotape was played.)
11        MR. RAMSELL:  Judge, I've stopped playing it at 6
12   minutes and 10 seconds.  I was trying to find that
13   conversation the officer had with the second guy, and I
14   don't know if it's before or after this.
15        THE COURT:  That's fine.  I don't know if -- I
16   think he kind of summarized it the way --
17        MR. RAMSELL:  Yeah.
18        THE COURT:  -- it was said, so -- Okay.
19        MR. RAMSELL:  I don't think it would add anything.
20   Your Honor, at this point I would rest on my direct.
21        THE COURT:  Okay.  It's now noon, and I have
22   another court call at 1:00 o'clock.  I can be back at
23   2:00 or if the parties want to discuss the possibility
24   of having this continued until tomorrow or Friday.  I'm

1    available both days in the morning.

2         MR. RAMSELL:  I'm not available either one, but I

3    can be here at 2:00.

4         THE COURT:  All right.

5         MS. NORTON:  Judge, I'm not sure if they have a

6    staggered call in Glendale Heights.  I don't know how

7    big their call is.

8         THE COURT:  It's not staggered.  It's, I think --

9         THE CLERK:  I can check.

10        THE COURT:  -- 39 cases; so ...

11        MS. NORTON:  Oh, that's not bad.  Okay.  Great.

12   2:00 o'clock is perfect.

13        MR. RAMSELL:  Thank you, Judge.  Your Honor --

14        MS. NORTON:  Officer Wise, you can be back at

15   2:00 o'clock, I take it?

16        THE WITNESS:  Yes.

17        MR. RAMSELL:  I'm sure it goes without saying that

18   the officer cannot discuss his testimony with anybody

19   including the prosecutor because he's still on the

20   stand.

21        THE COURT:  Yeah, that's correct.  Everyone knows

22   that, but we're reminded of it.

23        MR. RAMSELL:  Thank you, Judge.

24        THE COURT:  Thank you.

1          (Whereupon, the noon recess was had.)

2          THE COURT:  For the record, this is Village of

3    Lisle vs. Defendant Alex French for the continuation of

4    the statutory suspension hearing.  I believe we're at

5    the point in time where Mr. Ramsell was done with his

6    examination.  It's now time for cross-examination.  Is

7    everybody ready?

8          MS. NORTON:  We're ready, Judge.  I think that's

9    what you asked.

10          THE COURT:  Yes.

11          MR. RAMSELL:  Ready.

12          THE COURT:  Okay.  Officer, please, take the stand.

13    Remember you're still under oath.

14          THE WITNESS:  Yes, Judge.

15          MS. NORTON:  May I proceed?

16          THE COURT:  Yes.

17                    CROSS-EXAMINATION

18    BY MS. NORTON:

19          Q.    Officer Wise, the arrest in this incident

20    took place on April 28th, 2021, shortly before

21    10:00 o'clock p.m.; is that correct?

22          A.    Yes.

23          Q.    And at the time you were actually still --

24    You were in a marked squad car, correct?

```
1        A.    Correct, a marked Chevy Tahoe.

2        Q.    In the parking lot of the Lisle Police

3   Department; is that right?

4        A.    I was.

5        Q.    And you were observing traffic -- was it

6   from, like, the apron or the driveway of the police

7   department observing north and southbound traffic on 53?

8        A.    Yeah.  It was our northernmost driveway of

9   the front parking lot, and I was just watching traffic.

10       Q.    Okay.  And that stretch of road on 53 has how

11  many lanes?

12       A.    Two north, two south, with the occasional

13  turn-only lane.

14       Q.    Okay.  And south of that location, what's the

15  next major intersection?

16       A.    There's Short Street, which is just south of

17  us, and then there's Main Street.  And then the next

18  major intersection would be Maple Avenue.

19       Q.    Okay.  So Main Street is south -- Main Street

20  then Maple south?

21       A.    Correct.

22       Q.    There's a traffic signal at Main Street and

23  another traffic signal at Maple, correct?

24       A.    Correct.
```

1  Q. That area at the -- where the traffic light
2 is at Main Street, is it safe to say that's primarily a
3 residential area?
4  A. At Main Street, yes.
5  Q. And then as you proceed further south to
6 Maple it's more of a mixed residential and commercial
7 area, correct?
8  A. Well, that intersection's pretty much gas
9 stations, a strip mall, a Jewel-Osco; so there's really
10 not that much residential right at that intersection.
11  Q. Okay. And the -- What's the distance from
12 the police department to Maple, if you know? Less than
13 a mile or about a mile?
14  A. It's less than a mile. Maybe a half mile.
15  Q. Okay. And if you were to go north from the
16 police department, what's the next major intersection?
17  A. It would be Burlington Avenue.
18  Q. And there's -- And that's, again, kind of a
19 residential area there as well, correct?
20  A. That is, yes.
21  Q. Okay. And as you were observing the movement
22 of traffic on northbound Route 53, you actually observed
23 a number of vehicles that were all kind of -- as they
24 passed your location -- slowing down or stopping in the

1    curb lane and then making a lane change, correct?

2         A.    There were a couple, yes.

3         Q.    Okay.  So from your vantage point at the

4    police department you couldn't actually see the

5    obstruction in the roadway; is that correct?

6         A.    No, I could.  I just hadn't observed it yet.

7    I was more noticing the cars.  And then when I looked at

8    the cars and my attention got drawn to my left, is then

9    when I saw the obstruction.

10        Q.    Okay.  And what the distance of the vehicle

11   where it was stopped on the roadway from your location

12   at the police department, approximately?

13        A.    I don't know.  200 feet or so, 250 feet.

14        Q.    Okay.  And the police department, I take it,

15   was open for business?  It was illuminated, lit up at

16   that point in time --

17        A.    Yes.

18        Q.    -- at that time of the day?

19        A.    Yes.

20        Q.    Okay.  And when you proceeded out of the

21   police department parking lot you then made your way

22   over to that location, correct?

23        A.    Correct.

24        Q.    And, upon your arrival, you observed the

1    Defendant actually standing outside of the vehicle in

2    the lane of travel; is that correct?

3        A.    In the curb lane, yes.

4        Q.    But he was actually in the lane, correct?

5        A.    Yes.

6        Q.    He wasn't on the sidewalk or somewhere else,

7    correct?

8        A.    Correct.

9        Q.    And the vehicle -- It appears, at least from

10   the video, that the vehicle was in a stopped position

11   partially in the lane of travel and then partially on,

12   like, a parkway or a sidewalk or something?

13       A.    Correct.  It's a driveway to an office

14   building.  So the passenger side tires were partially on

15   that driveway, but a majority of the vehicle was still

16   in the road.

17       Q.    So on the apron of the driveway but not

18   pulled into the driveway, correct?

19       A.    Correct.

20       Q.    And is there -- Is that an open parking lot

21   where that driveway leads?

22       A.    Yeah.  There's no barriers or anything.

23       Q.    Okay.  And it was open, presumably?  A

24   vehicle could have pulled into that lot as well,


1    audio clicked on on your video?

2        A.   It might have been briefly just -- I might

3    have said, Are you okay, before the audio kicked in and

4    I said it again.

5        Q.   Okay.  And did you say that over a loud

6    speaker or were you actually out of your squad car at

7    that point in time?

8        A.   I was getting -- in the process of getting

9    out of my car.

10       Q.   Okay.  And, as you approached, you observed

11   obviously that the vehicle was disabled or appeared to

12   be disabled in the roadway, correct?

13       A.   Yeah.  It appeared to be, yes.

14       Q.   Okay.  And did you, upon pulling up to that

15   location, immediately activate your lights before you

16   got out of your car when you saw the Defendant standing

17   in the road?

18       A.   Yes.  I think in the video you see my lights

19   are activated as I'm pulling in behind him.

20       Q.   And that was both for community caretaking as

21   well as for a public safety function, correct?

22       A.   Correct.

23       Q.   Obviously you wanted to illuminate the area

24   so that approaching motorists could see that there was

1    an obstruction in the roadway, correct?

2        A.    Yes.

3        Q.    And you noted on numerous times both in your

4    initial encounter with him, as we saw in the video, and

5    then even here in court today that you thought it was

6    odd that he didn't have the hazard lights activated,

7    correct?

8        A.    I found that odd, yes.

9        Q.    Okay.  Now, he indicated to you that he

10   walked south of that location to the gas station at

11   Maple to get gas, correct?

12       A.    That's what he indicated, yes.

13       Q.    And in order to get from where the vehicle

14   was stopped to the gas station, he would have had to

15   walk right past the police department, correct?

16       A.    Correct.

17       Q.    To your knowledge, he never stopped at the

18   police department to ask for assistance or tell anybody

19   that the vehicle was stopped on the roadway?

20       A.    No, we did not get any notification.

21       Q.    And as you first observed him, you indicated

22   you said words to the effect of, Are you okay, correct?

23       A.    Something that effect.

24       Q.    And then did he sort of spontaneously turn

1    around and put his hands in the air at that point in

2    time or was that after your first spoken words to him?

3         A.    From what I remember, when I activated my

4    lights and started to position myself behind the vehicle

5    is when he set the gas can down and turned; and then as

6    I was exiting was the first time he put his hands up and

7    then kind of just started walking back towards me.

8         Q.    And then you said to him, you know, Hey, it's

9    okay, Don't worry about it, You can put your hands down?

10        A.    Something to that effect.

11        Q.    And you asked him if he was all right.  Then

12   you had an initial conversation with him.  He indicated

13   to you that he was coming from a date that had gone

14   badly.  Did he tell you -- He didn't tell you where he

15   was coming from, correct?

16        A.    No.  He just said he was on a date and, in

17   his words, said it didn't go well.

18        Q.    And we obviously heard the content of the

19   conversation.  Is it fair to say that he appeared to be

20   jumpy or jittery during your initial conversation with

21   him?

22        A.    During my initial interaction, yes.

23        Q.    And he had kind of a halted thought process;

24   he would start one sentence and then go to another

1    sentence or another thought; is that fair to say?

2         A.    Yes.

3         Q.    He seemed to have -- Well, I'll strike that.

4               And at that point in time you observed the

5    odor of the gasoline, correct?

6         A.    Initially, yes.

7         Q.    And you indicated that you observed gasoline

8    had been spilled on the side of the car and also on the

9    roadway, correct?

10        A.    Yes.

11        Q.    And throughout your conversation with him, he

12   periodically would put his hands up in the air; he was

13   apologizing repeatedly and was, again, jittery and kind

14   of fidgeting around; is that correct?

15        A.    Correct, looking around, yes, while --

16        Q.    And were those behaviors noteworthy to you?

17        A.    Yes.

18        Q.    And you also observed that he had spilled gas

19   on his hands in addition to on the vehicle and on the

20   street, correct?

21        A.    Correct.

22        Q.    And that was the primary or overwhelming odor

23   that you first observed, correct?

24        A.    Yes, initially, yes.

1    Q.    You noted that his eyes were red, bloodshot,

2  and watery, correct?

3    A.    I did.

4    Q.    And Mr. Ramsell asked you about that a little

5  bit, and he also asked you -- referenced the NHTSA 1997

6  report that eliminated bloodshot eyes as an indicator of

7  impairment.  Do you recall that line of questioning?

8    A.    I do.

9    Q.    And, in context, that document from NHTSA

10 actually says that we're not going to consider that a

11 factor -- and I'm paraphrasing -- because it could

12 affect -- a person's socioeconomic status could be

13 implicated more so than necessarily alcohol intoxication

14 as a result of bloodshot or glassy eyes.  Do you recall

15 reading that in the report?

16   A.    Something to that effect.  Also, I think it

17 mentioned shift work and ...

18   Q.    It talked about agricultural work, factory

19 work, things like that where they might be exposed to

20 different elements or shift work, as you've indicated --

21   A.    Correct.

22   Q.    -- correct?

23   A.    Yes.

24   Q.    So police officers who work a night shift

1    might have bloodshot eyes at times, correct?

2         A.    Certainly.

3         Q.    But it didn't tell -- There was nothing in

4    the Defendant's presentation that suggested he was

5    coming from work, correct?

6         A.    Coming from work, no.

7         Q.    And he specifically told you, actually, he'd

8    been coming from a date that went badly, correct?

9         A.    Yes.

10        Q.    And based upon his overall presentation and

11   his disordered thoughts and his answers to your

12   questions about why he didn't put the hazards lights on

13   in his car, you began to suspect that he was under the

14   influence of something, correct?

15        A.    I did, yes.

16        Q.    And to that point you had not yet noted an

17   odor of alcohol coming from his person, correct?

18        A.    An odor, no, not yet.

19        Q.    And it was at that point that you actually

20   began your inquiry regarding the performance or the

21   administration of standardized field sobriety tests,

22   correct?

23        A.    Right around there, yes.

24        Q.    And you indicated that you are an instructor

1    for standardized field sobriety tests?

2        A.    I am.

3        Q.    I don't know if Mr. Ramsell asked you, but

4    how many years have you been with the Lisle Police

5    Department?

6        A.    Almost 22 now.

7        Q.    And in the 22 years have you received

8    specific training in the detection and apprehension of

9    impaired drivers whether by alcohol or other

10   intoxicating substances?

11       A.    I have.

12       Q.    And when and where did you receive your first

13   training?  Was that at the police academy?

14       A.    The very first training would be the police

15   academy at the College of DuPage.

16       Q.    And approximately when was that?

17       A.    That would have been the late fall into early

18   winter of 1999.

19       Q.    And in your police academy training you

20   received theoretical and practical testing with regards

21   to the administration of standardized field sobriety

22   tests, correct?

23       A.    Correct.

24       Q.    And you passed both those portions of the

```
1    testing?
2         A.   I have.
3         Q.   And you were ultimately authorized to
4    administer standardized field sobriety tests, correct?
5         A.   Yes.
6         Q.   And you've indicated, in the course of your
7    career you've since become a standardized field sobriety
8    testing instructor?
9         A.   I have.
10        Q.   Meaning you teach others how to administer
11   standardized field sobriety tests, correct?
12        A.   Yes.
13        Q.   And have you also had continuing education
14   with regard to DUI enforcement?
15        A.   I have.
16        Q.   Can you give us an estimate of how many hours
17   of training you've undertaken with respect to DUI
18   enforcement?
19        A.   As far as hours go, it's probably at least --
20   probably over 100 hours, I would say.
21        Q.   And included in that approximate of 100 hours
22   you completed drug recognition expert training; is that
23   correct?
24        A.   I did.
```

Marcia Messina, CSR #084-003955

1     Q.    And was that a 40-hour course or was it --
2     A.    It's an 80-hour classroom portion with an
3  additional practical portion added on.
4     Q.    And you are certified as a drug recognition
5  expert pursuant to the NHTSA -- I'm sorry -- the
6  International Association of Chiefs of Police standards;
7  is that correct?
8     A.    I am.
9     Q.    And how many arrests have you made for
10  persons who you suspected to be under the influence of
11  alcohol or other intoxicating substances in the course
12  of your career?
13     A.    Over my entire career, I would say probably
14  close to maybe 800 or so.
15     Q.    And in both your personal and professional
16  life, I assume you've seen people who you knew to be
17  under the influence of alcohol?
18     A.    Correct.
19     Q.    Approximately how many times have you seen
20  people you knew to be under the influence of alcohol?
21     A.    Quite a -- Well over a thousand.
22     Q.    And with respect to drugs or other
23  intoxicating substances that are not alcohol, in the
24  course of your career how many times do you think you've

1    observed persons under the influence of drugs?

2         A.    Several hundred.

3         Q.    And so when you were having this encounter

4    with the Defendant you relied not only on the NHTSA

5    protocols that are documented in books and reports and

6    things like that published by the National Highway

7    Transportation Safety Administration, but you also

8    relied on your common sense and your experience and your

9    training; is that correct?

10        A.    Correct.

11        Q.    With regard to the administration of the

12   field sobriety tests, the first test that you

13   administered was the horizontal gaze nystagmus test,

14   correct?

15        A.    Yes, it is.

16        Q.    And you observed that the Defendant did have

17   equal pupil size and the ability to equally track with

18   both eyes, correct?

19        A.    Correct.

20        Q.    So by exhibiting those two factors, that

21   ruled out essentially any kind of organic or injury type

22   of situation with the Defendant, correct?

23        A.    Correct.

24        Q.    You then administered the remainder of the

1　horizontal gaze nystagmus test; and, on the totality,

2　you observed six clues, correct?

3　　　A.　Correct.

4　　　Q.　And it's fair to say that the horizontal gaze

5　nystagmus test is useful for establishing whether or not

6　an individual has likely consumed alcohol; is that

7　correct?

8　　　A.　Yes.

9　　　Q.　So notwithstanding the Defendant's statements

10　that he hadn't consumed alcohol, his --

11　　　MR. RAMSELL:　I'm going to get ahead of that.　As

12　soon as the question starts with the word "so," then we

13　know it's argumentative.

14　　　THE COURT:　I'll let her finish the question.

15　BY MS. NORTON:

16　　　Q.　In addition to observing the six clues on the

17　horizontal gaze nystagmus test, at that point in time

18　you were in fairly close proximity to the Defendant; is

19　that correct?

20　　　A.　Yes, I was.

21　　　Q.　And several minutes had elapsed where that

22　odor of gasoline had been permitted to dissipate some in

23　the air, correct?

24　　　A.　Correct.

1      Q.    And from that closer location to the
2   Defendant were you able to then observe an odor of
3   alcohol coming from his person?
4      A.    At that point, that's when I was able to
5   smell it, yes.
6      Q.    And how would you characterize the odor of
7   alcohol coming from the Defendant's person?
8      A.    Very strong.
9      Q.    And that was consistent with your
10  observations of six clues in the HGN, correct?
11     A.    Certainly, yes.
12     Q.    And in the test -- As he was performing that
13  test, you had initially told him not to move his head in
14  any fashion, correct, and to only move his eyes?
15     A.    Correct.
16     Q.    And, in fact, you had to remind him a number
17  of times not to move his head, correct?
18     A.    Yes.  I had to say not to move his head and
19  to also follow the stimulus multiple times.
20     Q.    And, as a result of that, you had to repeat
21  some of your passes on the HGN test, correct?
22     A.    At times I did, yes.
23     Q.    And you also observed that he was swaying in
24  a circular fashion while you were administering that

1    test; is that right?

2         A.    Correct.

3         Q.    After he completed that test did you believe

4    that he may be under the influence of alcohol?

5         A.    I thought it was a possibility, yes.

6         Q.    And then you requested him to do a

7    nonstandardized field sobriety test, the alphabet test,

8    correct?

9         A.    Correct.

10        Q.    And he indicated to you that he certainly

11   knew the English alphabet from "A" to "Z," correct?

12        A.    He did.

13        Q.    And he believed he would be able to perform

14   that test, correct?

15        A.    Correct.

16        Q.    And, in fact, he wasn't able to perform it at

17   all; is that fair to say?

18        A.    That is correct.

19        Q.    Not correctly anyway?

20        A.    Yes.  He did not perform it the way I asked.

21        Q.    You initially asked him to do the letters "E"

22   through "U," correct?

23        A.    That is correct, yes.

24        Q.    And after verifying that that was what you

1    wanted him to do, he stated the letters "E-F-G" and then

2    there was a pause and then "H-I-J" and then he stopped

3    and indicated he couldn't do it because it was too hard,

4    is that right, something to that effect?

5          A.    He said he couldn't do it and then, yeah, I

6    believe he said the test was hard.

7          Q.    And then you ultimately let him do the

8    letter -- the alphabet test from "A" to "Z," correct?

9          A.    Correct.

10         Q.    And that was at his request; is that right?

11         A.    Actually, I believe it was at my request;

12   but, yes.

13         Q.    Or your suggestion?

14         A.    Yes.

15         Q.    And at that point he was able to recite the

16   alphabet correctly from the letter "A" to the letter

17   "R," and then instead of following "R" with the letter

18   "S" he followed it with the letter "X"; is that right?

19         A.    Correct.

20         Q.    And then completed the alphabet from there,

21   "T-U-V-W-X-Y-Z," correct?

22         A.    Correct, with another pause between --

23         Q.    Between the "V" and the "W" there was a

24   substantial pause, correct?

1      A.    Yes.

2      Q.    And then you began to administer the

3  walk-and-turn test, as we saw on the video; is that

4  right?

5      A.    Correct.

6      Q.    And rather than ultimately performing the

7  test, the Defendant became agitated and argumentative,

8  is that fair to say, throughout your encounter with

9  that?

10     A.    Yes.

11     Q.    He was also unable to hold the starting

12  position, correct?

13     A.    Correct.

14     Q.    And broke his stance numerous times; is that

15  right?

16     A.    Yes.

17     Q.    Did you observe him swaying during the

18  initial phase of the test?

19     A.    Slightly, yeah, I mean, causing him to break

20  out of position, yes.

21     Q.    And he remained jittery and continued to

22  exhibit a somewhat disordered thought pattern as you

23  were trying to explain to him what you were asking him

24  to do, correct?

1       A.    Correct.

2       Q.    And Mr. Ramsell asked you question about,

3   Well, why didn't you just arrest him, or, What did you

4   mean when you said you were giving him more

5   opportunities to take the test. Do you recall that line

6   of questioning?

7       A.    I do.

8       Q.    And, in fact, you -- the Defendant didn't

9   actually refuse to take the test; he just kept insisting

10   that he wanted you to do the test with him, correct?

11       A.    Correct.

12       MR. RAMSELL:  I'm going to object. That's just him

13   interpreting what took place on the film instead of

14   telling us what happened. He's now interpreting his

15   version of --

16       MS. NORTON:  Judge, I'll rephrase the question.

17       MR. RAMSELL:  The Defendant didn't really argue --

18   you know, in essence, he did this. Well, this is not

19   closing argument through Officer Wise.

20       MS. NORTON:  I'll withdraw the question and

21   rephrase, Judge.

22       THE COURT:  Okay.

23   BY MS. NORTON:

24       Q.    You asked the Defendant a number of times,

1   Are you refusing to do the test.  Do you recall asking

2   him those questions?

3       A.    I do.

4       Q.    Did he ever answer you with a yes or a no?

5       A.    Not initially, no.

6       Q.    So how many times do you think you had to ask

7   him if -- You had to ask him numerous times, basically,

8   if he was refusing to take the test --

9       A.    Correct.

10      Q.    -- before you got a straight answer from him?

11      A.    Correct.

12      Q.    And that's the point at which you made the

13  determination that you were going to place him under

14  arrest, correct?

15      A.    Correct.  Once he formally told me he wasn't

16  going to do any more tests, yes.

17      Q.    Okay.  And throughout the totality of your

18  encounter with the Defendant did you formulate an

19  opinion as to whether or not he was operating a vehicle

20  under the influence of alcohol or was in actual physical

21  control of a vehicle?

22      A.    I did.

23      Q.    And what was that opinion?

24      A.    That the Defendant was under the influence of

1      alcohol.

2            Q.    And what did you base your opinion on?

3            A.    I based it on the fact that the Defendant did

4      not -- as we learn in basic driving school, did not have

5      his hazards on for a disabled vehicle; the fact that he

6      was having difficulty in getting the gas into his car

7      with a simple gas can; then eventually the red,

8      bloodshot, and watery eyes; the very strong odor of an

9      alcoholic beverage on his breath; his jittery, nervous

10     nature; his inability to follow simple directions, at

11     times; some -- his changing of stories or accusing -- or

12     saying that he didn't say anything when he actually did;

13     and then the performance on the field sobriety tests

14     that we were able to perform.  All those taken into

15     consideration is how I formed my opinion.

16           Q.    Thank you.  One last thing, the vehicle that

17     he was driving, do you recall the year, the make and

18     model of that vehicle?

19           A.    I know it was a Jeep Wrangler, all black.  I

20     believe it was a 2018 or maybe 2019.

21           Q.    And it was equipped with hazard lights, as

22     far as you know?

23           A.    Yes.

24           MS. NORTON:  I have no other questions, Your Honor.

Marcia Messina, CSR #084-003955

1    THE COURT:  All right.  Mr. Ramsell, any redirect?

2    MR. RAMSELL:  Yes.  Thank you.

3                    REDIRECT EXAMINATION

4  BY MR. RAMSELL:

5    Q.   Let me go through a couple of these items.

6  You talked about nervousness when I was asking you a

7  line of questions, but I just heard you explain the

8  reasons why you arrested -- or believed Mr. French was

9  under the influence and you didn't mention nervousness.

10  So why was that not a factor then, in your opinion?

11    A.   It was a factor.

12    Q.   No.  You said the hazards, the gas, the

13  performance of the field tests, the odor of alcohol, and

14  his eyes.

15    A.   Actually, I said jitteriness too.

16    Q.   Okay.  Great.  So I just want to ask you

17  this, you know, have you ever testified that you

18  believed somebody had drugs in the car because they were

19  nervous?

20    A.   Yes.

21    Q.   Okay.  Now -- And you said you had hundreds

22  of hours of training.  You don't have an opinion that

23  Mr. French was under the influence of drugs that night,

24  do you?

22  and he's driving them all towards DUI.  I'm asking him

23  whether they can be driven towards other things.

24    THE COURT:  Yeah.  If he's got experience, he can

1      MS. NORTON:  Objection, beyond the scope.

2      MR. RAMSELL:  No.  They brought it up a bunch.

3      THE COURT:  Yeah.  I'll let him answer.

4   BY MR. RAMSELL:

5      Q.  Right?

6      A.  I didn't have that opinion, no.

7      Q.  Okay.  So we can exclude that, yes?

8      A.  Correct.

9      Q.  And he had told you during the stop before

10  the field test that he had a concealed carry license and

11  you learned of that, yes?

12     A.  I was notified by dispatch.

13     Q.  And he told you that he had a gun in the car,

14  yes?

15     A.  After I asked him, yes.

16     Q.  Right.  Do you think that might make somebody

17  nervous in the days we live in?

18     MS. NORTON:  Objection.

19     MR. RAMSELL:  No.  It --

20     MS. NORTON:  It calls for speculation.

21     MR. RAMSELL:  But he's interpreting all these facts

22  and he's driving them all towards DUI.  I'm asking him

23  whether they can be driven towards other things.

24     THE COURT:  Yeah.  If he's got experience, he can

1  answer the question.

2  BY MR. RAMSELL:

3      Q.   Do you think the fact that he had a gun in

4  his car could contribute to him being nervous about the

5  situation and keep his hands in the air?

6      A.   If the gun is in his car, he's not -- doesn't

7  have access to it; so I don't see why he would be

8  nervous.

9      Q.   So you didn't think that when he told you he

10  had a gun in the car and he kept his hands in the air

11  that that might not have been the reason for his

12  nervousness; you immediately went to it being alcohol,

13  right?

14      A.   Correct.  I mean --

15      Q.   Because you've had 800 DUI arrests or more --

16  I'll withdraw that question.

17          Do you -- Have you ever received any awards

18  for, you know, how many DUI arrests you've made from,

19  let's say, AAIM or other organizations of that nature?

20      MS. NORTON:  Objection, relevance.

21      MR. RAMSELL:  It is relevant, Judge.

22      MS. NORTON:  Beyond the scope.

23      MR. RAMSELL:  It goes to his basis.

24      THE COURT:  I'll sustain the objection.  I don't

1    see the relevance of if anyone's acknowledged what his

2    number of DUI arrests is.

3         MR. RAMSELL:  The argument would be that somebody

4    who receives an award based on, you know, how many fish

5    they catch tend to catch more fish because they like

6    awards.  I do.  I like blue ribbons.  So it would be a

7    bias towards arrests.  Just like 800 arrests are a lot

8    of arrests, so that's a lot of awards.

9         MS. NORTON:  Mr. Ramsell is --

10        MR. RAMSELL:  I'll leave it for argument, Judge.

11        THE COURT:  Thank you.  I appreciate it.

12   BY MR. RAMSELL:

13        Q.   Now, so you've had training in NHTSA, field

14   sobriety training, student level, yes?

15        A.   Correct.

16        Q.   NHTSA field sobriety instructor level?

17        A.   Correct.

18        Q.   ARIDE, have you had ARIDE training, Advanced

19   Roadside Impaired Driving Enforcement?

20        A.   Yes.

21        Q.   Also covers field sobriety tests, yes?

22        A.   Correct.

23        Q.   And you've had DRE testing -- I mean, you're

24   a certified DRE examiner?

1          A.    Correct.

2          Q.    With a rolling log?

3          A.    Correct.

4          Q.    All right.  One, two, three -- Four levels

5    that all address field sobriety tests, yes?

6          A.    Correct.

7          Q.    All right.  During these four levels of field

8    sobriety testing, did any of them say that not -- any of

9    them say moving your head during the HGN test is a clue

10   of impairment?

11         A.    It's not a scorable clue, no.

12         Q.    Right.  So don't you think if that was a sign

13   of intoxication, the fact that some people move their

14   heads when you move your finger, don't you think after

15   four levels of field sobriety testing at least one of

16   these levels would have already figured out that it was

17   a clue if it really was for impairment?

18         A.    Again, it's not a clue.  It's a cue.

19         Q.    It's -- In fact, nobody even has it in their

20   manual that it's a sign of intoxication; isn't that

21   true?

22         A.    It's an inability to follow directions.

23         Q.    So I'm -- You can point out a manual that

24   says that not moving your head or keeping your head

1    still is a sign of impairment?  Which manual says that,

2    the --

3         A.   I didn't say that.

4         Q.   -- student manual, the instructor manual, the

5    ARIDE manual, or the DRE manual?

6         MS. NORTON:  Objection.

7    BY THE WITNESS:

8         A.   I didn't say that.

9         Q.   None of them do, do they?  Do they?

10        A.   No.

11        Q.   Let me ask you this:  So you would have been

12   taught the history and the development of the

13   standardized field sobriety test battery in your

14   classes, yes?

15        A.   Correct.

16        Q.   Marcelline Burns, Herb Moskowitz, Jack

17   Stuster in the 1970s were tasked with developing a

18   standardized field sobriety test battery.  You know the

19   history.

20        A.   For the most part, yes.

21        Q.   Yeah.  And isn't it true that they were --

22   what they did was, they were given a whole host of

23   possible sobriety tests such as finger-to-nose, tracing

24   on paper, finger-to-thumb tests, alphabet; and they

1    boiled it down to the three best were the HGN, the

2    walk-and-turn, and the one-leg stand, correct?

3        A.    Those are the ones they validated, yes.

4        Q.    Right, that's what they boiled it down to.

5    They rejected the A-B-C test --

6        MS. NORTON:  Objection.

7        MR. RAMSELL:  Bare with me.  May I finish?

8        MS. NORTON:  Objection, Judge; relevance, beyond

9    the scope.  I certainly never went into all of the

10   validation studies that were ever done to develop the

11   field sobriety testing --

12       MR. RAMSELL:  May I --

13       MS. NORTON:  -- protocol by NHTSA.

14       MR. RAMSELL:  May I argue?

15       THE COURT:  Okay.  Well, you went into the

16   performance on the alphabet test; so I think he can ask

17   questions about the validity of them.

18   BY MR. RAMSELL:

19       Q.    So the alphabet test did not make the final

20   cut in terms of keeping it for use as a standardized

21   field sobriety test back in the '70s --

22       MS. NORTON:  Objection.

23   BY MR. RAMSELL:

24       Q.    -- is that what you learned?

1      THE COURT:  That's been asked and answered.  He
2  said, No, it's not.
3      MR. RAMSELL:  Okay.
4  BY MR. RAMSELL:
5      Q.   And that's because it was -- performance
6  could be directly connected to nervousness as opposed to
7  impairment or language difficulties and a variety of
8  nonimpairing causes.  You learned that, didn't you, as
9  an instructor?
10     A.   Correct.
11     Q.   Now, Ms. Norton pointed out that you had
12  asked Mr. French to put -- you know, get in the starting
13  position of the walk-and-turn test.  Do you remember
14  that line of questioning?
15     A.   Yes.
16     Q.   But you never actually said, Remain in that
17  position until I tell you to begin"; you never got to
18  that point, did you?
19     A.   No, I did.
20     Q.   So you told him on that video, Remain in that
21  position with your left foot in front of your right
22  foot?
23     A.   Yeah, until I tell you to start.
24     Q.   Okay.  And there's a variety of levels of

1    smell of odor of alcohol that you have, yourself, used

2    to describe in some of your reports:  faint, moderate,

3    strong, right?

4         A.   Correct.

5         Q.   So you're telling the judge, first off, that

6    the heavy odor of gasoline that you initially observed

7    about Mr. French, his person, and the area he was

8    standing in dissipated completely within 10 minutes of

9    you arriving there, is that what you're telling the

10   judge, so that you could then smell alcohol?

11        A.   Yes.

12        Q.   All right.  And during that 10 minutes, about

13   5 minutes in he's still trying to pour more gas in the

14   trunk of his -- in the tank of his car, yes?

15        A.   There was an attempt, yes.

16        Q.   And you're saying that he was having

17   difficulty; he was spilling it everywhere, but somehow

18   that also dissipated when he made that second attempt at

19   pouring gas into his car so that you could now smell

20   alcoholic beverage on him at the 10-minute mark?

21        A.   I never said he spilled it the second time.

22        Q.   Second time he didn't have any trouble

23   spilling it?

24        A.   No.  I never said he spilled it the second

1    time.

2         Q.    All right.  And --

3         A.    In fact, I never saw him actually spill it.

4    I just saw gas already on the ground when I got there.

5         Q.    So what I'm curious about is this:  Given his

6    balance and speech on the video, were you surprised that

7    the level of the odor of alcoholic beverage you say you

8    smelled wasn't just faint or moderate or strong but was

9    very strong?  Do you understand my question?

10        A.    I do not.  Could you repeat it, please?

11        Q.    Yeah.  You know, how come -- How could he

12   have a very strong odor of alcohol -- I guess that's the

13   highest strength of odor you could smell -- yet his

14   balance was as it shows on there and his speech was as

15   it shows?

16        MS. NORTON:  Objection, calls for speculation.

17   There are plenty of functioning adults --

18        MR. RAMSELL:  You're right.

19        MS. NORTON:  -- out there --

20        MR. RAMSELL:  It is speculative.

21        MS. NORTON:  -- who are well-balanced --

22        THE COURT:  Okay.

23        MR. RAMSELL:  I agree.

24        THE COURT:  I'm going to sustain the objection.

1    BY MR. RAMSELL:

2         Q.    So this was the strongest odor of alcoholic

3    beverage you could or have smelled in 800 arrests.  This

4    is the top of the strength, the very strong; or is there

5    another level you've described in reports of 800 people?

6         A.    Is there a question?

7         Q.    Yeah.  When you use the phrase "very strong,"

8    is that the highest level of strength of alcohol that

9    you have described across 800 DUI arrests?

10        A.    Probably the term I use the most, yes.  I may

11   have used --

12        Q.    So no one --

13        A.    -- something stronger, but --

14        Q.    No one in 800 DUI arrests that you have made

15   has ever had a stronger odor of alcohol than Mr. French

16   had --

17        MS. NORTON:  Objection.

18   BY MR. RAMSELL:

19        Q.    -- in this case; is this your testimony?

20        MS. NORTON:  Objection, relevance.

21        THE COURT:  I'll sustain it.  It's not relevant to

22   this case.

23        MR. RAMSELL:  Well, I think it's relevant to the

24   idea of exaggeration, Judge; but I'll leave it for

1    argument if you would like.

2         THE COURT:  Okay.

3    BY MR. RAMSELL:

4         Q.   Did you actually see him spilling gas when he

5    was pouring it into the car?

6         A.   No.

7         Q.   You just saw some on the ground and smelled

8    it and it was very -- I'm sorry -- very strong?

9         A.   I smelled it and I saw it on the ground and

10   it -- down the side of his car.

11        Q.   And you think that when people pour gas into

12   a -- you know, a car that's out of gas like that, that

13   they generally don't smell of gasoline; is that what

14   you're trying to tell the judge?

15        A.   I know I've never had a problem doing it, and

16   I've never smelled it on myself; so ...

17        Q.   I don't, you know -- I apologize.  What kind

18   of car did you say this was?

19        A.   Jeep Wrangler.

20        Q.   Is it the one where you got to, like, you

21   know, push in the nozzle kind of hard to get the -- you

22   know, the flap to open up before you can get the gas in?

23   Does it have one of those automated flaps on it or is it

24   just a hole that's there for the taking?

1    A.    I'm not sure.  I didn't examine it.

2    Q.    All right.  And this unit that Mr. French was

3  pouring from, this canister, it was plastic, right?

4    A.    It appeared to be, yes.

5    Q.    Did it have one of those little flaps that

6  you flip up to allow, like, you know -- so there's a

7  long nose nozzle and you have that flap; otherwise, it

8  kind of comes out in spurts when you pour?  Do you know

9  what I'm talking about?  I'd talk -- I'd tell you, like,

10  about shotgunning a beer because that also -- you know,

11  you use that -- I don't think that's a -- You're too

12  young for that.  Did it have the hole unplugged so that

13  when you pour it it doesn't go glug, glug, glug.

14    A.    I don't know.  I didn't examine the can.

15    MR. RAMSELL:  Okay.  I have no other questions,

16  Judge.

17    THE COURT:  All right.  Any recross-exam based upon

18  the redirect?

19    MS. NORTON:  No.

20    THE COURT:  All right.  Mr. Ramsell, how would you

21  like to proceed?

22    MR. RAMSELL:  We rest, Judge.

23    THE COURT:  All right.

24    MS. NORTON:  May Officer Wise step down?

1    THE COURT:  Yes.  You're released, Officer Wise.

2              (Witness excused.)

3    MS. NORTON:  I move for a directed finding just for

4    purposes of procedure.

5    THE COURT:  Okay.  That will be denied.  The case

6    law that I have --

7    MS. NORTON:  And, Judge, I -- The Village rests, I

8    guess, just to make that clear.

9    THE COURT:  Okay.  Thank you.

10   MS. NORTON:  And I did provide the Court and

11   Mr. Ramsell with a copy of *People vs. McDonough*,

12   M-C-D-O-N-O-U-G-H, which is cited in the *Patel* decision

13   that was provided by Mr. Ramsell.  That's located at

14   239 Illinois 2d 260.  It's an Illinois Supreme Court

15   case from 2010.

16   MR. RAMSELL:  I have one extra case to supply,

17   Judge, called *People v. Thomas*.  This is just about

18   nervousness and reasonable suspicion.

19   THE COURT:  All right.  And the other cases I have

20   submitted by Mr. Ramsell are *People vs. Bianca*,

21   *People vs. Patel*, *People vs. Mitchell*, and also

22   *People vs. Rockey*.  I'd like an opportunity to read the

23   case law.  Mr. Ramsell, it's your petition.

24   MR. RAMSELL:  I'm ready to argue.

1        THE COURT:  I appreciate that, but I'm not ready to
2     rule.
3        MR. RAMSELL:  Oh, I apologize.
4        THE COURT:  I'd like to look at the case law.  I
5     might have a better frame of reference if I read the
6     case law and then we argue.
7        MR. RAMSELL:  Yes, Your Honor.
8        THE COURT:  But I'm happy to let you argue and make
9     notes and then read the case law if that's your
10    preference.
11       MR. RAMSELL:  I prefer to argue, and that way maybe
12    it directs.  So may I proceed, Your Honor?
13       THE COURT:  Yes.
14        CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT
15       MR. RAMSELL:  Judge, there's no dispute that
16    Officer Wise was allowed to approach this disabled
17    vehicle and to provide assistance.  No problem there.
18    We are not disputing that.  But, Judge, the case law
19    that we gave to you -- So even if that was consensual or
20    community caretaking like Ms. Norton threw out there,
21    once the officer takes the identification and retains it
22    it becomes a seizure.  According to Illinois law, if all
23    that Mr. French had done was improperly parked his
24    vehicle without the lights on -- and there's a citation

1    for it; I'm accepting that was not -- that he should
2    have had the blinkers on -- the case law is that the
3    police officer shall then, without unnecessary delay,
4    proceed to issue that ticket.  Unless reasonable
5    suspicion of another offense comes before that officer,
6    they have to proceed with the ticket and allow the
7    motorist to then go.
8            But what the officer did was, he kept the
9    identification on him.  And until he returned it, as in
10   the case law -- so it's a seizure when you take it, so
11   there's no more community caretaking functioning at that
12   point -- and the continuing retention of it then is a
13   continuing seizure, as is noted, I think, in the *Rockey*
14   decision out of the Second District.  Now, he didn't
15   bother to write that ticket.  He went to the side; he
16   calls for backup.  If you listen closely to the video,
17   you will hear him call for backup.  And as I heard what
18   he said -- And I'm not going to quote it exactly.  It
19   speaks for itself.  He called for backup that he was
20   going to do further investigation.  It wasn't -- There
21   was a reason he called for that backup, and that's
22   really early in this thing.  There's no basis for that,
23   Judge.
24           When that second -- Now what he does is he

1    runs a computer check on this driver even though he has

2    a facially valid license.  This is a deeper

3    investigation than was necessary, but I don't think it's

4    illegal.  As long as he's moving forward with the ticket

5    and writing it, he can run -- he can run that.  That's

6    fine.  But it's clearly a seizure at that point.

7         Now, what happens next is the second officer

8    arrives on the scene.  And although it's whispered, it's

9    not whispered that much.  You can pick it up.  He says

10   he's going to -- He thinks -- What's the quote?  I'm

11   pretty sure he's been drinking, and said something like,

12   So I'm going to take it in that direction.  Then he

13   reapproaches the driver.  So he's already said what he's

14   going to do; and at that point, Judge, all you have is

15   the odor of gasoline and a guy pouring gas in the car,

16   explaining that his car ran out of gas.  There's no --

17   He's got the clarity of mind -- Remember, driving under

18   the influence, this isn't secret sauce on a Big Mac.

19   This is driving under the influence, which Illinois

20   courts have had the same definition of since the 1950s.

21   It's not -- It doesn't require microanalysis because our

22   courts say it's -- a layperson is capable of saying

23   whether they believe somebody's under the influence of

24   alcohol.  It's not some secret thing where you need to

1    be given a super set of glasses through four levels of

2    DUI school to see it.  Those are helpful, don't get me

3    wrong; but it's not that they can see something we

4    can't.  It's not like a Where Is Waldo.  It's simply to

5    assist the officer.

6            But look at the video.  This isn't one where

7    your eyes aren't relevant and only Officer Wise's eyes

8    are.  Look at that video.  This is just a guy who's run

9    out of gas, okay.  It's obvious he's got his hands up.

10   Does that -- When you see that, Your Honor -- And,

11   remember, this is -- We're supposed to look at this

12   through the lens of a reasonable person, not a

13   reasonable police officer, not a -- a reasonable person.

14   Look at that.  When somebody does that and they say, I

15   have a gun in my car, does -- is that -- does that lead

16   anyone to have a reasonable suspicion that that man's

17   under the influence?  All right.  We'll give it maybe a

18   hunch, but it certainly isn't near that.

19           Now, he took Mr. French's nervousness -- And

20   I'm going to say this:  Look at that video.  Does it

21   really look like Mr. French is that nervous?  You know,

22   in a way, that sort of looks like Don Ramsell out there

23   arguing his case.  That does not look like some nervous

24   dude.  But accepting that, Mr. Wise saw nervousness.

1    That's really difficult to pick up there.  I don't think

2    we have to completely shun that idea.  How does that

3    lead to that he's a DUI?  Because, you know, I gave you

4    that case just now, *People vs. Thomas,* that says

5    nervousness does not equate to a reasonable suspicion.

6    Do you want to know why?  Because, Your Honor -- and

7    you're a very learned attorney and jurist -- that

8    nervousness is used if you're in the west side of

9    Chicago, it's a drug dealer or it's a drug possession.

10    Nervousness in another area is -- they're stealing cars,

11    and nervousness is this and nervousness -- Nervousness

12    is nothing, and it certainly isn't a sign of whether

13    somebody's under the influence of alcohol.  It's the

14    opposite.  Alcohol is a depressant.  It makes people not

15    nervous, and it makes people relaxed.  It's the opposite

16    of that.  It doesn't make them nervous and jittery.  And

17    Officer Wise admitted that even though he used these

18    things he observed as reasons to suspect that a guy who

19    smells of gasoline might be under the influence --

20    That's what he had:  nervousness, jitteriness, the smell

21    of gasoline, and bloodshot eyes.  And from that he

22    returned to the car and requested field sobriety tests.

23             Now, I gave you *People vs. Patel.*  It

24    mentions *People vs. McDonough* and the others.  And these

1    cases -- And there's a -- *McDonough* and *Patel*, they're

2    very instructive, what would be reasonable suspicion to

3    continue to detain a motorist beyond the mere traffic

4    citation.  And in *Patel*, it was a speeding ticket

5    situation; but in that case the appellate court reversed

6    the trial court, found reasonable suspicion because

7    there was an odor of alcohol along with the defendant

8    admitting drinking at a bar about 35 minutes prior to

9    the stop.  That was reasonable suspicion.  They then

10   said -- So that was enough.

11           But in the *Patel* case they also then go

12   through other cases.  And in *McDonough*, the officer

13   smelled alcohol when the driver rolled down the window;

14   and the driver admitted to having three drinks.  Also in

15   *Patel* they note a case -- it says, Village of

16   Plainfield, 304 Ill. App. 3d at 342.  Stopped for a

17   cracked windshield; reasonable suspicion to detain for

18   field sobriety tests was found when there was smelling

19   alcohol, bloodshot glossy eyes, slurred speech, and

20   defendant admitted drinking three to four beers in the

21   past hour.  They also cite *Village of Lincolnshire vs.*

22   *Kelly.*  There, reasonable suspicion was found based on

23   an odor of alcohol and defendant's admission of drinking

24   one glass of wine.

1     We have no alcohol, no admission of drinking,

2  and he kept him.  That's the fulcrum.  What did the

3  officer know at the time he detained him further after

4  he told the second officer, I'm going to keep him for an

5  investigation, and reapproached and said, Now I'm going

6  give you field sobriety tests.  All these cases have an

7  odor of alcohol at that time and an admission of

8  drinking, at least an odor of alcohol.  This is none of

9  that.

10     Now, the other problem, Judge, is none of

11  those cases -- And this is just a crow on my side.  All

12  of those cases completely repeat the old wives' tale

13  that bloodshot eyes had anything to do with being under

14  the influence.  24 years ago the National Highway

15  Traffic Safety Administration rejected that.  No one

16  seems to pay attention to that, but now it's in the --

17  now it's finally in the record; so -- But, regardless,

18  you can't just have bloodshot glassy eyes.  It's not

19  that somebody's a shift worker.  It doesn't mean their

20  job has to be from 12:00 to 7:00 a.m. or 3:00 to

21  midnight.  It's the idea that at night fatigue and just

22  nighttime -- being up late, your eyes can become that

23  way regardless -- And that's what they meant by shift

24  workers, those people that have that; or, I guess, you

1  know, if you're somewhere in a smokey bar, if there is
2  such a thing anymore.  I don't know.  But the point is,
3  Judge, when he asked him to stay and he kept him there
4  and he unlawfully prolonged the stop to have this person
5  submit to field sobriety tests, that was illegal.  That
6  was improper.  It was based on a hunch or a guess or
7  speculation, at best, because he was nervous, because he
8  was nervous.

9          I gave you a case, Judge, that says -- in the
10  second district, *Bianca*, that a defendant exceeding to
11  the officer's direction and performing field sobriety
12  tests is also a seizure.  It's a continuing seizure.  So
13  this is a second-level seizure, if you will, that has to
14  be justifiable.  I don't think there's any dispute on
15  that line of cases anymore.  Even *McDonough* that was
16  given to you would say so.  So let's -- But, you know,
17  wait; there's more, Judge.  Let's even accept for the
18  sake of argument that all up to this point is still
19  appropriately acceptable under the Fourth Amendment, all
20  right.  He gives an HGN test.  I'll eat the clock off
21  that wall if he did it four seconds each time, four
22  passes.  That's up to Your Honor to see it.  It wasn't
23  there.  It's not hard to count to four in your mind.
24  You don't even need a timer.  But it wasn't there.  He

1    didn't give it appropriately.  And if the test isn't

2    performed correctly, under the Illinois Supreme Court

3    case of *People v. McKown*, it cannot be used.  And

4    there's a series -- a line of cases that repeat that.

5    He didn't follow the protocol.  But the officer himself,

6    before I confronted him with the actual performance,

7    admitted that he was trained if you don't follow the

8    protocol the validity of the test is compromised.  Even

9    if the test was given properly, under *People v. McKown*,

10   all that can lead to is the possibility that someone may

11   have consumed alcohol and, therefore, may be under the

12   influence.  It's not proof that someone's impaired.  But

13   this officer said he relied on it to believe the man was

14   under the influence of alcohol, so he misused the test

15   for more than the Supreme Court of Illinois has said

16   it's worth in that case.  So not only did he not do it

17   correctly, but he also improperly relied on its value in

18   determining whether to arrest the Defendant.

19          Pouring gas into a car, seriously, I don't

20   know a single individual that has ever run out of gas

21   and poured gas in their car that didn't smell like

22   gasoline.  That's, like, hand in hand.  So, again, it's

23   not whether Officer Wise is so deft at pouring gas into

24   the tank of a car out of a container that he never

1    smells of gasoline; it's what's reasonable.  Does that
2    mean that somebody's impaired?  Is that a sign of
3    impairment?  Would you ever think that, Judge?  The same
4    definition of being under the influence applies to the
5    experiences of life, not some microanalysis in that
6    direction.
7            So, you know, he tells us -- And I'm sorry
8    but, you know, he's the witness.  He tells us that not
9    moving -- or moving the head during the HGN test, that's
10   a sign of impairment, is what he wanted to suggest.
11   Well, after four levels of training, not a single agency
12   that he respects as authoritative and reliable has ever
13   suggested that.  And if that's such a clue, what is it,
14   they're just missing the obvious?  The National Highway
15   Traffic Safety Administration missed it during all of
16   that?  No.  It's not a clue.  The absence of it tells us
17   that.
18           Look at him standing there.  The easiest way
19   to look at this video, Judge, and see what Mr. French's
20   balance is like is easy.  Just point out a still object
21   like a parked car and watch Mr. French's body in
22   relationship to the car, the edge of the car, the
23   taillight.  He's not swaying.  He has no difficulty with
24   his balance.  His speech is clear.  For you to believe

1    that it's impaired speech, Judge, would be to ignore

2    what we all know as signs of a person that's under the

3    influence.  His speech is clear.  His recitation of what

4    took place, how he ran out of gas, where he went to get

5    gas at, that he walked, that he purchased it, that he

6    came back.  Anybody make a call, There's a drunk in the

7    roadway walking down the road?  No one made any calls.

8    There's none of that.  It's all made up.

9             And, yes, Mr. French did get aggravated with

10   Officer Wise.  Officer Wise wanted one thing.  He wanted

11   an investigation, and he wanted Mr. French to do those

12   tests.  And, frankly, Officer Wise is a very

13   well-trained, experienced officer.  We know that just

14   from cross-examination.  Why does he keep trying to get

15   somebody that he's so certain is under the influence to

16   do that test?  Because nobody else is certain.  I don't

17   think Officer Wise was either.  The argument he went

18   through, 10 minutes of arguing with Mr. French --

19   Mr. French thought Officer Wise -- I mean, this is my

20   review of the video here.  It looks like Mr. French

21   receives Officer Wise as a helper, a community

22   caretaker.  And as the case devolves into taking the

23   license from him, retaining the driver's license,

24   bringing a second officer to the scene, holding all that

1    back, starting to question Mr. French about things that

2    Mr. French would think are really not relevant to, you

3    know, you're going to help me with my gasoline

4    situation, now it's, Where have you been, Where have you

5    been drinking, What drugs may you have been taking, and

6    then finally devolves into field sobriety tests, yeah, I

7    think Mr. French's response, however inappropriate it

8    might be and unprofessional to the police officer, in a

9    degree, was not respectful.  It was not unreasonable

10   because it went from, you know, helping him with his gas

11   to now they're investigating him for a crime and he gets

12   mad.  But he explained and he repeated and it was with

13   quite a skill of language how he believed the tests

14   weren't going to benefit him.

15          And, you know what, when I asked Officer Wise

16   how the test would benefit Mr. French, he told us he'd

17   already basically made up his mind that he was under the

18   influence.  He didn't say that this was still an open

19   case and maybe it would go one way or the other

20   depending on what Mr. French did.  He did what

21   Mr. French thought, formed an opinion before he even did

22   the test that he was under -- that Mr. French was under

23   the influence; and it was his intention he was going to

24   arrest him.  No problem.  Mr. Wise isn't the only person

1     at the scene that probably can read some body language,

2     however subtle it might be.  He declined the test.

3     Officer Wise says -- Well, I'll put it this way:  Does

4     it look like the two of them banged heads and does it

5     look like Officer Wise used his position that he didn't

6     get the investigation he wanted and so it -- The call

7     was like a flip of a coin; but arrest or release,

8     there's no impaired driving, no accident.  And, no, you

9     can't take a car that runs out of gas on the roadway and

10    get it to make a right turn into a driveway now with

11    power steering, Judge.  We know that.

12              This is below probable cause to arrest.  The

13    benefit of having an audio and video is that the Court

14    gets a -- virtually a de novo look at the evidence.  You

15    don't have to say anybody's this, that, or the next

16    thing.  You say, I see it in a different light.  It's as

17    simple as that.  And, Judge, this very strong odor of

18    alcohol troubles me.  Experiences -- It doesn't matter

19    to me whether gas is leaded or unleaded.  It smells bad

20    and it's strong and it doesn't dissipate that rapidly,

21    in my experience.  But even if it did, how -- As I

22    pointed out, does this person look like the type of DUI

23    out of 800 that would rate to the strongest smell of

24    alcohol Officer Wise has ever seen or is this possibly

1     filling in blanks where they're missing.  Maybe he

2     wanted to smell it that strong if he smelled it at all.

3            I'm not -- I don't think you necessarily have

4     to find Officer Wise not credible.  I'm not asking for

5     that.  I'm not asking that there be -- You know, my

6     argument is only my own; and your findings are

7     independent of whatever I say.  And if you rule in my

8     client's favor, you can do so with rejecting every

9     argument I made.  And I'm fine with that and that's

10     reasonable and that's what you are.  You're an

11     independent jurist.  But if this is how low we go,

12     imagine Mr. French -- Well, imagine the reasonable

13     person innocent of any crime standing on that roadway at

14     that moment.  What does that person have to do?  Do they

15     have to waive their right to demand that they be

16     released, Let me go, I choose not to participate in your

17     investigation of me, I don't believe you have any basis

18     for making me go through field sobriety tests.  If they

19     do that, as Mr. French does here, the government wants

20     to argue that now we get to arrest him and it's DUI.

21     No.  It's an uncooperative citizen attempting to assert

22     his liberties; and whether you do or do not have the

23     evidence falls on its own merits, not on Mr. French's

24     declination of the search and seizure that the officer

1    wanted to perform.  He gets the right to say no.

2              Does he risk it all, as he did here, and

3    let's see what the police officer on the other end --

4    how he reacts?  And the reaction here was, no surprise,

5    arrest for DUI.  And, as he said, You know what, We'll

6    just take it up in court.  That was respectful.  He used

7    his voice, and he knows that the final arbiter is in

8    court.  That's how it's supposed to be done.  Does he do

9    that as a reasonably -- a reasonable person innocent of

10   a crime or does he take a chance and do these tests and

11   see what happens there?  Who would advise someone who

12   had an odor of gasoline and bloodshot eyes to ever do

13   field sobriety tests?  No one has to risk or prove their

14   innocence at the scene.

15             So what we have here, Judge, is speculation.

16   Maybe he was; maybe he wasn't.  Maybe he was drinking;

17   maybe he wasn't.  Maybe he was impaired; maybe he

18   wasn't.  But we don't arrest on all those maybes, so I

19   would ask, Judge, that you grant the petition on any one

20   of those grounds leading up to the arrest and for

21   whatever reasons Your Honor feels are appropriate.

22         THE COURT:  All right.  Village.

23     CLOSING ARGUMENT ON BEHALF OF THE VILLAGE OF LISLE

24         MS. NORTON:  Judge, recognizing that this is a

1    summary suspension hearing and not a trial, I will try
2    to keep it brief.  I would submit to the Court that the
3    *McDonough* decision and *Patel*, as provided by
4    Mr. Ramsell, are probably the two most salient cases
5    that you have in your stack of materials there to look
6    at; and they -- basically both of those cases direct the
7    Court as to exactly what Officer Wise did in this
8    situation.
9              The officer's not required to attribute the
10   Defendant's strange behavior and his disordered thoughts
11   to mere nervousness or the fact that he has gas on his
12   hands or all over the side of the car.  When we're
13   talking about impairment, we're talking about the
14   ability of an individual to think and act with ordinary
15   care in the operation of a motor vehicle.  Mr. Ramsell
16   talked at great length about secret sauce.  I would
17   submit to the Court that it's not secret sauce to know
18   how much gas you have in your tank.
19             Ordinary care is the amount of care that it
20   takes to operate your vehicle safely and properly to get
21   from Point A to Point B; or if you can't get from
22   Point A to Point B, then to get from Point A to a gas
23   station.  There was a gas station within approximately a
24   half a mile of this location, a police department within

1    about 200 feet of the location, and an empty driveway

2    leading to a parking lot within 10 feet or right at the

3    zero mark of where this car came to rest in the middle

4    of the roadway.  This Defendant didn't think and act

5    with ordinary care when he was driving his car that day,

6    and those facts were not lost on Officer Wise.

7            Clearly, everything that you saw on the video

8    and everything that the officer testified to provided

9    very reasonable -- a reasonable trajectory in terms of

10   the evolution from the community caretaking encounter

11   when Officer Wise first rolls up on the scene and is

12   perplexed by the fact that this guy's standing in the

13   roadway trying to put gas in the car with no hazard

14   lights on and it's a dark roadway.  He's there for a

15   very justifiable, reasonable, and appropriate purpose at

16   that point in the time.  And the minute this Defendant

17   starts talking -- And you can see his behavior.  It's

18   not normal behavior.  It's not that of a person who's

19   right-thinking and rationally minded who has just run

20   out of gas.  It's a guy who's trying to get the heck out

21   of Dodge before he catches the notice of the police

22   department.  That's why he didn't put his hazards on.

23   That's why he didn't stop at the police department to

24   ask for help.  He didn't want to have anything to do

1   with the police.  They were right there and perfectly
2   capable of helping him and he didn't want that.
3              This evolved very naturally, very organically
4   from a community caretaking function to the officer
5   having reasonable grounds to believe that this Defendant
6   was under the influence of alcohol.  There was nothing
7   unreasonable about the conduct of the police officer.
8   And any kind of Fourth Amendment analysis, it hinges on
9   the reasonableness of the officer's conduct.  And I
10  would submit to the Court that everything Officer Wise
11  did and the totality of the circumstances -- and that's
12  what the courts talk about in *Patel* and *McDonough* --
13  absolutely supports and validates what Officer Wise did
14  in these circumstances on that date.
15             The Defendant's conduct was clearly
16  unreasonable.  He had greatly disordered thoughts.  He
17  exhibits an odor of alcohol.  And a reasonable,
18  right-thinking person capable of exercising ordinary
19  wouldn't have gone off on that ridiculous tangent
20  demanding that the officer perform the test with him.
21  They asked him several times on the video, Are you
22  refusing to do the test.  All he needed to do is say no.
23  Mr. Ramsell argued, you know, he has a right to say no.
24  Of course he does.  If he would have just said that, it

1    would have -- we would have ended this encounter
2    10 minutes before it was over on the video.  If he would
3    have just said no, they would have made their decision
4    and done what they did, whether they let him go, whether
5    they arrested him -- They probably would have arrested
6    him, I would submit to the Court; and I think they would
7    have had enough even then, but add to that this crazy
8    behavior that he exhibits in the course of the attempt
9    of the administration of field sobriety tests, the
10   inability to do the alphabet test, the observation of
11   the six points on the HGN, the odor of alcohol that the
12   officer observed.
13            I would also note, Judge, this isn't like --
14   You know, in the *Patel* decision there was -- Is it *Patel*
15   or *McDonough* where they talk about -- the guy said he
16   was coming from a bar and admitted to having two IPAs?
17   Granted, this Defendant repeated denied consuming
18   alcohol; but, you know, he didn't -- It was a late hour,
19   late in the day.  It was nearly 10:00 o'clock at night,
20   dark on the roadways.  He didn't say he was coming from
21   working a late shift or working shift work or coming
22   from church or coming from a ballet recital or a book
23   club or anything like that.  He was coming from a date,
24   so it's not unreasonable for the officer to think, Well,

1    he probably had some alcohol.  He couldn't smell it

2    because the odor of the gasoline was overwhelming at

3    that point.

4         But it's the totality of the circumstances,

5    common sense, training and experience, and all of those

6    things have to be kind of correlated when the officer's

7    making the decision that he had to make that day.

8    Everything that Officer Wise did was reasonable.  His

9    decision to place this Defendant under arrest after

10   their encounter was reasonable and supported by a well

11   thought-out process, as he articulated on the stand

12   today.  So respectfully I'd ask that the Court deny the

13   petition to rescind and confirm the suspension.

14        MR. RAMSELL:  Final reply, very -- extremely short.

15        THE COURT:  Sure.

16        REBUTTAL ARGUMENT ON BEHALF OF THE DEFENDANT

17        MR. RAMSELL:  I think Ms. Norton pointed out very

18   accurately if Mr. French had just said no, straight up,

19   it's possible he would have been let go.  That's what I

20   heard her say, and that's why you should grant the

21   petition because it didn't reach the point where

22   Mr. French should have been arrested.  It was still an

23   open question.

24        Now, Judge, what day would you like us to

1    hear your ruling?  We can do that by Zoom if that's
2    possible.
3          THE COURT:  It's up to you how you want to ...
4          MR. RAMSELL:  Next Wednesday?  Is it Wednesday?
5          MS. NORTON:  It's still Wednesday, as far as I
6    know; although, we've been here an awfully long time,
7    Mr. Ramsell.
8          THE COURT:  No.  We're talking about next
9    Wednesday.
10         MS. NORTON:  No, I know.  He asked me if it was
11   still Wednesday.
12         MR. RAMSELL:  Next Wednesday?
13         MS. NORTON:  Judge, I can be available whenever the
14   Court wishes.
15         MR. RAMSELL:  We'll leave the video with you too.
16         THE COURT:  Okay, yeah.  I was going to say, I'd
17   like to review the video again.  I'm sure you guys have
18   had multiple opportunities, but -- Next Wednesday I'll
19   be coming back from Glendale.  I could be here, like,
20   11:00 if that is good for everybody.
21         MR. RAMSELL:  Sounds good to me.
22         THE COURT:  Okay.
23         MS. NORTON:  I'm in this courtroom anyway, so I'll
24   be here.  Do you want me to -- I'll put it at 10:35 for

1     in-person.  You'll actually physically be here then,

2     Mr. Ramsell?

3          MR. RAMSELL:  I don't know.  Can we just ...

4          MS. NORTON:  Well, I mean, I guess you don't need

5     to be here if it's just for ruling.  We're not opening

6     that can and letting you talk again.

7          MR. RAMSELL:  If I come here, you know that.

8          THE COURT:  Thank you, Officer.  Thank you, both

9     attorneys, for the arguments.  And then I'll get here as

10    soon as I can from Glendale next Wednesday in the

11    morning.

12                    (The hearing was continued to 10:35 a.m.,

13                     June 16, 2021.)

14

15

16

17

18

19

20

21

22

23

24

```
1              IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT

2                      DUPAGE COUNTY, ILLINOIS

3

4

5              I, MARCIA MESSINA, do hereby certify that the

6       foregoing Report of Proceedings, consisting of Pages 1

7       to 98, inclusive, was reported in shorthand by me, and

8       the said Report of Proceedings is a true, correct and

9       complete transcript of my shorthand notes so taken at

10      the time and place hereinabove set forth.

11

12

13

14         _____Marcia Messina_____

15                    Marcia Messina
                   Official Court Reporter
16         Eighteenth Judicial Circuit of Illinois
                      DuPage County
17            CSR License No. 084-003955

18

19

20

21

22

23

24
```